## Bruce and Martha Webb v. Navistar International Transportation Corporation

[692 A.2d 343]

No. 93-501

Present: **Gibson, Dooley, Morse and Johnson, JJ., and Peck, J. (Ret.), Specially Assigned**

Opinion Filed December 20, 1996

Motion for Reargument Denied January 3, 1997

*A. Gregory Rainville* of *Farrar & Rainville* and *Michael Rose* (On the Brief), St. Albans, for Plaintiffs-Appellees.

*Samuel Hoar, Jr.* of *Dinse, Erdmann & Clapp*, Burlington, and *John A. Rupp* and *Ann L. Gibson* of *Coffield, Ungaretti & Harris*, Chicago, Illinois, for Defendant-Appellant.

*Peter B. Joslin* and *John Davis Buckley* of *Theriault & Joslin, P.C.*, Montpelier, and *Victor E. Schwartz, Mark A. Behrens* and *David Bernstein* of *Crowell & Moring*, Washington, D.C., for Amicus Curiae Product Liability Advisory Council.

*Michael F. Hanley* and *Barney L. Brannen* of *Plante, Hanley & Gerety, P.C.*, White River Junction, for Amicus Curiae Kim P. Lussier.

**Dooley, J.** Defendant Navistar International Transportation Corporation (Navistar) appeals from a jury verdict that held defendant liable to plaintiffs Bruce and Martha Webb on a theory of strict products liability for a design defect and/or failure to warn plaintiffs of dangers inherent in the design of a tractor. A majority of the Court agrees to reverse and remand this case.

Justice Morse, Justice Peck and I hold that principles of comparative causation apply in this products liability action. We do not agree, however, to a general rule on when comparative principles apply in strict products liability actions, nor on how to implement these principles when they do apply. I believe this case must be reversed and remanded for a new trial because the trial judge failed to instruct the jury on comparative causation. Justice Morse concludes that Bruce Webb is more than fifty percent responsible, as a matter of law, and therefore, under 12 V.S.A. § 1036 (comparative negligence), he would enter judgment for defendant. Justice Peck agrees with Justice Morse that judgment should be entered for defendant but on the ground that the tractor is not defective as a matter of law. Justice Johnson and Justice Gibson would affirm the judgment for plaintiffs; they would hold that comparative principles are not applicable in products liability actions.

■ The positions of the Justices produce no majority on the mandate. A majority of the Court agrees, however, that the judgment entered on the jury verdict cannot be affirmed. Thus, although Justices Morse and Peck would prefer a mandate of "reversed," they have joined in a mandate of "reversed and remanded" because it accurately represents the center of gravity of the Court. See *Cell v. Drake*, 100 P.2d 949, 951 (Idaho 1940). Thus, the mandate requires a new trial based on principles of comparative causation.

The dissent criticizes the majority for creating a rat's maze from which there is no exit. We strongly disagree with the characterization of the cause or consequence of the Court's voting. If the dissent would accept that comparative causation has now become the rule in products liability cases in Vermont, and participate in an implementation design to guide future cases, the trial judge in this case might know exactly what to do on remand. If a majority could not agree on an implementation design, the trial judge and parties would at least know the full range of options and votes in support of each on this Court. I share Justice Peck's view that we should do all in our power to avoid stalemate, if possible.

## I.

On November 13, 1985, at approximately 9:30 p.m., Bruce Webb learned that some of his cows might be out of the pasture. He and his father got out their tractor, a 1978 Model 464 farm tractor manufactured by Navistar, and they proceeded down Route 207 with Bruce

Webb standing on the draw bar and his father driving. En route, the tractor was struck in the rear by a car driven by an allegedly intoxicated operator. As a result of the accident, Bruce Webb suffered serious injuries to his legs.

Plaintiffs filed suit against Navistar, the driver of the car, and others. The complaint alleged negligence, breach of warranty, and strict products liability. Claims against all defendants other than Navistar were ultimately dismissed, and the case proceeded to trial against Navistar solely on the products liability claim. Plaintiffs argued that the tractor was defectively designed because (1) it allowed operation of a white field light at highway speeds without provision for separate red tail lights, and (2) it failed to provide a safe passenger location so that Bruce Webb could have ridden on the tractor without exposure to injury. They contended further that defendant failed to provide adequate warnings of these dangers.

The case was tried, and the trial court directed a verdict in defendant's favor on both claims. On appeal, we affirmed the directed verdict regarding defendant's failure to provide a safe passenger location, but reversed as to whether the design of the field light was defective and whether the manufacturer's warning on its use was inadequate. See *Webb v. Navistar Int'l Transp.*, No. 91-384 (Vt. July 1, 1992) (*Webb I*) (unpub. mem.).

The second trial focused on the lighting system of the tractor. The Model 464 tractor has a red taillight, two amber lights with road flashers, two red rear reflectors, a reflective slow-moving-vehicle triangle and a white field light mounted on the left rear bumper. A cautionary decal on the left front fender directs operators to use the flashing amber lights at all times when on public roads. The light system is designed so that when the flashing amber lights are in use, the red taillight activates and the white field light does not work. At the time of the accident, the flashing amber lights[1] and the taillight did not work, and the reflectors were missing. In addition, by riding on the draw bar, Webb blocked the view of the reflective triangle. The cautionary decal also warned against riding the tractor unless a seat or platform is provided and instructed the operator to "[k]eep others off."

The owner's manual for the tractor also provides warnings and instructions. On pages 3 and 4, the manual sets forth rules for safe

---

[1] There was some evidence that one of the amber lights was functioning but covered from the driver's view by Webb.

operation of the tractor. Here, the manual warns: "No riders allowed." It also contains an instruction not to use the white field light on the highway on page 55, under the heading CAUTION!

Webb testified that while travelling on the highway he employed both the headlights and the rear field light on the rationale that more light was better than less light. He indicated that it had not occurred to him that operating the tractor on the highway at night with the rear field light on was a hazard. The operator of the automobile that collided with the tractor testified that he believed the white field light mounted on the left rear bumper was the headlight of an approaching "one-eyed" car.

Plaintiffs tried the case on two theories: (1) that the lighting system was defective because it allowed the tractor to be operated on highways with the field light illuminated, and (2) that defendant failed to adequately warn consumers of the known risk of using the field light while operating the tractor on the highway. The jury returned a verdict in favor of plaintiffs on liability, and the parties stipulated to damages. Defendant appeals, arguing that the evidence was insufficient to support the verdict and that the court erred by failing to instruct the jury that it may apportion liability between the parties. We have the benefit of briefs of amicus parties on both sides of the comparative liability issue.[2]

## II.

Defendant argues that the evidence was insufficient for the jury to find that its tractor was defective, that its warnings were inadequate, and that either the defective tractor or the inadequate warnings proximately caused Webb's injuries. These arguments all

---

[2] The Product Liability Advisory Council, Inc. (PLAC) is a nonprofit corporation with a membership of more than 100 major manufacturers in industries ranging from electronics to automobiles to pharmaceutical products. PLAC was formed for the purpose of submitting amicus curiae briefs in appellate cases involving significant public policy issues affecting the law of products liability. PLAC argues that comparative fault principles should be applied in strict liability actions brought under Vermont law.

On the other side of the issue is amicus curiae Kim Lussier, who currently has a products liability action pending in the United States District Court for the District of Vermont against a Texas corporation that manufactured the industrial ice handling equipment involved in a work-related accident in which Lussier lost his leg. Because the jurisdiction of the federal court is based upon the diversity of citizenship of the parties, a definitive decision here would determine whether comparative negligence is a defense to Lussier's claim. Lussier argues that comparative negligence should not be a defense in a products liability action.

war with our decision in *Webb I*. On this point, I understand that four of us agree. Except for those eliminated by our decision in *Webb I*, the parties' claims and defenses remained essentially the same at the second trial. If *Webb I* remains the law, the evidence was sufficient for the jury to reach a judgment against defendant. See *McGee Constr. Co. v. Neshobe Dev., Inc.*, 156 Vt. 550, 556, 594 A.2d 415, 418 (1991) (verdict will be sustained if, considering evidence in light most favorable to verdict and excluding effect of modifying evidence, there is evidence fairly and reasonably tending to support it).

The jury could reasonably conclude that the danger of operating the tractor on a highway at night with the field light illuminated was not a danger obvious to the ordinary consumer, and plaintiffs presented evidence of a safety device that could have been installed by defendant to prevent such use. Despite the evidence that the automobile operator was intoxicated and changed his story between the time of the accident and the trial, the jury could reasonably conclude that the lighting system on the tractor was defective and was the cause of the accident. Moreover, the question of whether a manufacturer provided adequate warnings about foreseeable dangers is a question of fact properly left to the jury. See *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 658 (2d Cir. 1992) (applying Vermont law).

## III.

█ I do not believe, however, that the judgment in this case can be affirmed. I agree with defendant that comparative liability principles are applicable in strict products liability actions and should have been charged to the jury in this case. Because the split in the Court reserves the details of implementing comparative principles for another day, I state only the reasons we adopt a comparative causation rule.

█ The doctrine of strict products liability was first developed by the California Supreme Court in *Greenman v. Yuba Power Products, Inc.*, 377 P.2d 897, 901 (Cal. 1962), and then set forth in the Restatement (Second) of Torts § 402A (1965). This doctrine was created in response to the limitations of traditional negligence and warranty actions for injuries caused by defective consumer goods. *Butaud v. Suburban Marine & Sporting Goods, Inc.*, 555 P.2d 42, 44 (Alaska 1976). In negligence actions, plaintiffs were unable to isolate the negligence of the manufacturer as manufacturing processes became more complex. *Id.* In actions based on warranty theories,

plaintiffs confronted defenses of disclaimer, notice of breach and lack of privity, also problematic in complex distribution systems. *Id.*; see also *O'Brien v. Comstock Foods, Inc.*, 125 Vt. 158, 162, 212 A.2d 69, 72 (1965) (abolishing privity requirement to prove liability of food producer). Strict products liability removed the difficulties plaintiffs faced in proving warranty or negligence claims against mass producers and distributors by imposing liability upon them without regard to fault or privity of contract. See W. Keeton, et al., Prosser and Keeton on the Law of Torts § 98, at 692 (5th ed. 1984). The purpose of this judicially created doctrine is to lessen the burden of proof for plaintiffs injured by defective products. *Daly v. General Motors Corp.*, 575 P.2d 1162, 1168 (Cal. 1978); see also *Zaleskie v. Joyce*, 133 Vt. 150, 154-55, 333 A.2d 110, 113 (1975) (one reason to adopt strict products liability is to respond to problems of availability of proof).

Justifications for reducing plaintiffs' burden rest upon two public policies. First, strict liability protects the consumer, see Restatement (Second) of Torts § 402A cmt. c (consumer entitled to maximum protection), by creating an incentive for manufacturers to produce safe products, see, e.g., *Whitehead v. Toyota Motor Corp.*, 897 S.W.2d 684, 693 (Tenn. 1995) (strict liability encourages greater care in manufacture of products), or as other courts have stated, a deterrence to producing unreasonably dangerous products. See, e.g., *Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 637 A.2d 603, 607 (Pa. 1993) (strict products liability imposes deterrent to production of dangerous products). Second, strict products liability is justified on the ground that manufacturers are in the best position to spread the cost of injury resulting from defective products by passing it on to consumers as a cost of doing business. *Zaleskie*, 133 Vt. at 154-55, 333 A.2d at 113; *Greenman*, 377 P.2d at 901; see also Restatement (Second) of Torts § 402A cmt. c (public policy demands that burden of accidental injuries caused by products be placed on those who market them who may treat as cost of production against which liability insurance may be obtained).

In 1975, we adopted the doctrine of strict products liability set forth in the Restatement (Second) of Torts § 402A. See *Zaleskie*, 133 Vt. at 155, 333 A.2d at 114 (judicially adopting doctrine of strict products liability as set forth in the Restatement (Second)). Under that doctrine, a manufacturer is strictly liable for physical harm or property damages resulting from a defective product that reaches a user without undergoing substantial change. *Kinney v. Goodyear*

*Tire & Rubber Co.*, 134 Vt. 571, 574, 367 A.2d 677, 679 (1976). A defective product "must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402A cmt. i. The plaintiff bears the burden of proving that the product is defective, and that its defect was the proximate cause of the harm, see *Gilman v. Towmotor Corp.*, 160 Vt. 116, 119, 621 A.2d 1260, 1261 (1992) (proximate cause is one element of strict liability), but is relieved of showing that the defendant was negligent. *Kinney*, 134 Vt. at 574, 367 A.2d at 679.

■ A manufacturer also has a duty to warn users and consumers when it knows or has reason to know of dangers inherent in the product at the time the product is sold, Restatement (Second) of Torts § 402A cmt. k, or when the product is dangerous to an extent beyond that which would be contemplated by an ordinary consumer. *Menard v. Newhall*, 135 Vt. 53, 55, 373 A.2d 505, 507 (1977). To establish strict liability for an inadequate warning, a plaintiff must prove that the inadequate warning made the product unreasonably dangerous and was the proximate cause of the injury. *Id.* at 54, 373 A.2d at 506.

■ Under the Restatement (Second) formulation of products liability, defenses are limited. Assumption of risk is a complete bar to recovery. "If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, [the user or consumer] is barred from recovery." Restatement (Second) of Torts § 402A cmt. n. Product misuse has traditionally been a bar to recovery as well. *Id.* § 402A cmt. h; see, e.g., *Kennedy v. City of Sawyer*, 618 P.2d 788, 796 (Kan. 1980) (assumption of risk and product misuse traditionally barred all recovery for strict products liability claims); *Smith v. Smith*, 278 N.W.2d 155, 161 (S.D. 1979) (recovery barred where consumer assumes risk or misuses product). On the other hand, the Restatement (Second) provides that negligence that "consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence" is not a defense at all. Restatement (Second) of Torts § 402A cmt. n.

The Restatement (Second) does not address the issue of shared responsibility and does not address the effect of the user's negligence beyond the limited circumstances described in comment n to § 402A. If we view these omissions as intentional, and we choose to follow

§ 402A, we are left with the harsh "all-or-nothing" approach of negligence actions prior to the adoption of our comparative negligence statute. Compare *Langevin v. Gilman*, 121 Vt. 440, 446, 159 A.2d 340, 344 (1960) (there can be no recovery for plaintiff if plaintiff negligence contributed "in the least degree" to accident) with 12 V.S.A. § 1036 (contributory negligence shall not bar recovery by plaintiff in negligence action, but plaintiff negligence may proportionately reduce damages).

The overwhelming majority of states have rejected the "all or nothing" rule, either by rejecting the limits of § 402A or by supplementing its provisions, and have applied principles of comparative liability in strict products liability actions. *Whitehead*, 897 S.W.2d at 691; see, e.g., *Kaneko v. Hilo Coast Processing*, 654 P.2d 343, 354 (Haw. 1982) ("[W]e eliminate the harshness of the 'all or nothing' bar to recovery that results if a plaintiff is found to have misused the product or to have assumed the risk of using the product."); *Suter v. San Angelo Foundry & Machine Co.*, 406 A.2d 140, 147 (N.J. 1979) (applying comparative negligence statute to strict liability action to relieve inequities incurred by plaintiffs and defendants as result of all-or-nothing approach to recovery); see also *Butaud*, 555 P.2d at 45-46 (adopting comparative principles in strict products liability actions); *Daly*, 575 P.2d at 1172 (same); *Kennedy*, 618 P.2d at 796-97 (same); *Austin v. Raybestos-Manhattan, Inc.*, 471 A.2d 280, 288 (Me. 1984) (same); *Zahrte v. Sturm, Ruger & Co.*, 661 P.2d 17, 18-19 (Mont. 1983) (same); *Thibault v. Sears, Roebuck & Co.*, 395 A.2d 843, 848 (N.H. 1978) (same); *Day v. General Motors Corp.*, 345 N.W.2d 349, 357 (N.D. 1984) (same); *Sandford v. Chevrolet Div. of Gen. Motors*, 642 P.2d 624, 628 (Or. 1982) (same); *Fiske v. MacGregor, Div. of Brunswick*, 464 A.2d 719, 727 (R.I. 1983) (same); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 425 (Tex. 1984) (same); *Star Furniture Co. v. Pulaski Furniture Co.*, 297 S.E.2d 854, 863 (W. Va. 1982) (same); *Dippel v. Sciano*, 155 N.W.2d 55, 64-65 (Wis. 1967) (same).[3] The United States District Court for the District of Vermont has endorsed this approach and predicted we will do so also. See *Smith v. Goodyear Tire & Rubber Co.*, 600 F. Supp. 1561, 1568 (D. Vt. 1985).

---

[3] In addition, some states have adopted comparative principles in strict products liability actions by statute. See, e.g., Ark. Code Ann. § 16-64-122 (Michie 1987 & Supp. 1995); Colo. Rev. Stat. § 13-21-406 (1987); Minn. Stat. Ann. § 604.01 (West 1988 & Supp. 1997); Miss. Code Ann. § 11-7-15 (1972); Mo. Ann. Stat. § 537.765 (Vernon 1988); N.Y. Civ. Prac. L. & R. § 1411 (McKinney 1976); Utah Code Ann. §§ 78-27-37, -38 (1996); Wash. Rev. Code Ann. §§ 4.22.005, .015 (West 1988).

In addition, the tentative draft of the Restatement (Third) of Torts provides for apportioning liability between the plaintiff and the manufacturer or seller. See Restatement (Third) of Torts: Products Liability § 7 (Tentative Draft No. 1, 1994). Similarly, the Uniform Comparative Fault Act § 1 provides that a claimant's contributory fault proportionately reduces compensatory damages in strict products liability actions. 12 U.L.A. 127 (1996). Many commentators maintain that adopting comparative liability principles in strict products liability actions is the fairest approach. See, e.g., Keeton, et al., *supra*, § 102, at 712 (comparative fault system fairest way to allocate costs of accidents); D. Noel, *Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk*, 25 Vand. L. Rev. 93, 117-18 (1972) (contributory negligence should diminish plaintiff's damages); V. Schwartz, *Strict Liability and Comparative Negligence*, 42 Tenn. L. Rev. 171, 179-81 (1974) (comparative principles should apply in strict products liability); J. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 850 (1973) (same).

The primary reason that courts adopt comparative liability principles in strict products liability actions is "because it is fair to do so." *Daly*, 575 P.2d at 1172. Adopting comparative liability principles "will accomplish a fairer and more equitable result" because the plaintiff's award is reduced by an amount equal to the degree to which the plaintiff is responsible for the accident. *Kaneko*, 654 P.2d at 352. Most courts reject the framework that places the burden of loss on one party where two parties contributed to causing the injury. *Daly*, 575 P.2d at 1172. Comparative liability principles also further fairness by preventing a negligent plaintiff from recovering as much as a plaintiff who has taken all reasonable precautions. *Smith v. Goodyear Tire & Rubber Co.*, 600 F. Supp. at 1568.

Moreover, there is no reason to impose the cost of a plaintiff's negligence upon the manufacturer to spread among other consumers of the product. *Daly*, 575 P.2d at 1168-69; see also Restatement (Third) of Torts: Products Liability § 7 cmt. a (Tentative Draft No. 1, 1994) (unfair to impose costs of substandard plaintiff conduct on manufacturers, who will be impelled to pass on costs to all consumers, including those who use and consume product safely). The instant case is illustrative. Here, plaintiff stood on the draw bar of the tractor while it traveled down a public road. Although he understood the importance of the warning against such action, he chose to disregard the warning. As a result, he blocked the view of the reflective triangle

and the single amber flashing light that may have been operable. Moreover, he failed to maintain the reflectors and the other flashing light. If the jury may reduce plaintiff's recovery to the extent that his injuries were caused by his negligence, defendant is not held liable for the cost of injuries attributed to plaintiff's negligence and does not pass this cost on to those farmers who heed the warnings posted on their tractors. Strict products liability was intended to spread the cost of injuries resulting from defective products; it was never intended to spread the cost of injuries resulting from user negligence. *Daly*, 575 P.2d at 1166.

Apportioning liability more effectively spreads recoveries from manufacturers for selling defective products than the "all or nothing" framework. Under the "all or nothing" framework, some plaintiffs receive windfalls because they collect damages for injuries caused by their own negligence in addition to damages for injuries caused by the product defect. On the other hand, some plaintiffs receive nothing because the court or jury has determined that their negligence constitutes misuse, assumption of risk or an intervening cause, concepts often difficult to distinguish. See *Sunday v. Stratton Corp.*, 136 Vt. 293, 300, 390 A.2d 398, 402 (1978). Applying principles of comparative liability will reduce the total damages awarded to some plaintiffs but will also extend recoveries to some plaintiffs formerly barred from any recovery; thus, recoveries will be more equitably distributed among plaintiffs.

A minority of courts have rejected comparative liability principles in the context of strict products liability actions and continue to impose the "all or nothing" framework set forth in the Restatement (Second) of Torts § 402A. See, e.g., *Bowling v. Heil Co.*, 511 N.E.2d 373, 380 (Ohio 1987) (finding no rationale to persuade it that comparative fault principles should apply to products liability actions); *Kimco Dev. Corp.*, 637 A.2d at 606 (declining to extend negligence concepts to strict products liability area); *Smith v. Smith*, 278 N.W.2d at 160-61 (negligence of either party is irrelevant in strict liability).

We draw two reasons from those decisions for retaining the "all or nothing" rule. First, several courts have suggested that it is too confusing to inject negligence concepts into strict liability actions, see, e.g., *Kimco Dev. Corp.*, 637 A.2d at 606 (conceptual confusion would ensue should negligence and strict liability concepts be commingled), and that juries will be unable to compare a defective product with a plaintiff's negligent conduct to apportion liability. See *Smith v. Smith*, 278 N.W.2d at 161 n.7 (adoption of comparative fault would present unworkable problems for juries).

Most courts have rejected this concern as semantic and theoretical. "We are convinced that in merging the two principles what may be lost in symmetry is more than gained in fundamental fairness," *Daly*, 575 P.2d at 1172, and "fairness and equity are more important than conceptual and semantic consistency." *Kaneko*, 654 P.2d at 352. Further, apportioning liability will be less difficult for juries than the current framework, which requires juries to distinguish between defenses that courts and scholars are often unable to differentiate. As the Supreme Court of Texas noted, assumed risk and unforeseeable misuse are nothing more than extreme variants of contributory negligence. See *Duncan*, 665 S.W.2d at 423. And the line between contributory negligence — resulting in total recovery — and assumed risk or misuse — resulting in no recovery — is difficult to draw. See *Thibault*, 395 A.2d at 848 (distinction between assumption of risk and contributory negligence merely semantics); Noel, *supra*, at 128 (distinctions between misuse, contributory negligence and assumption of risk are not clear); cf. *Perkins v. Windsor Hosp. Corp.*, 142 Vt. 305, 310, 455 A.2d 810, 813-14 (1982) (error to introduce assumption of risk language into charge on comparative negligence). There is no need to draw shadowy lines between misuse, assumption of risk and contributory negligence, however, if all defenses may constitute a basis for apportioning liability. Schwartz, *supra*, at 175.

Second, the "all or nothing" courts maintain that comparative principles would undermine the purposes of imposing strict liability on manufacturers because this approach reduces the incentive to produce safe products and fails to allocate the risk for loss from injury to manufacturers who are in a better position to absorb it. See *Kimco Dev. Corp.*, 637 A.2d at 606-07. On the contrary, applying principles of comparative liability in strict products liability actions is completely consistent with the purposes of imposing strict liability on manufacturers. Indeed, it will have no effect on the principal purpose of adopting this doctrine; the plaintiff is still relieved from proving negligence of the manufacturer or privity of contract with it. See *Daly*, 575 P.2d at 1168 (plaintiffs continue to be relieved of proving negligence). Manufacturers remain strictly liable for injuries resulting from their defective products. *Kaneko*, 654 P.2d at 353.

Nor is it clear that adopting comparative principles will significantly reduce the incentive to produce safe products. Cf. *Swett v. Haig's, Inc.*, 164 Vt. 1, 7 n.3, 663 A.2d 930, 933 n.3 (1995) (in dram shop action, dram shop's incentive to avoid serving intoxicated persons is not reduced by availability of contribution from intoxicated motorist).

Recoveries may be reduced in some cases, but more plaintiffs will recover if assumption of the risk and product misuse are no longer total bars to recovery. Overall, the cost of a defect may be the same under either approach.

Courts rejecting comparative liability assume that the primary purpose in strict products liability actions is to spread the cost of injury. Because manufacturers are in a better position than plaintiffs to spread this cost, they reason that it is inconsistent with strict products liability to reduce recoveries in proportion to plaintiff negligence. See, e.g., *Bowling*, 511 N.E.2d at 380; *Kimco Dev. Corp.*, 637 A.2d at 606. If spreading the cost of all injuries were the goal, then apportioning liability between the parties would be adverse to the goal.[4] We note, however, that the purpose has been to spread the cost of injuries resulting from *defective products*. The issue here is whether to spread the cost of injuries resulting from *user negligence* in addition to that resulting from a defect. No rationale to support such risk allocation has been presented. Strict liability is not absolute liability; manufacturers are not insurers of user safety. *Daly*, 575 P.2d at 1166; *Kaneko*, 654 P.2d at 353; *Mulherin v. Ingersoll-Rand Co.*, 628 P.2d 1301, 1302 (Utah 1981).

On balance the reasons to adopt comparative principles greatly outweigh the reasons to reject this approach. The comparative approach is fairer to all parties, and properly implemented, will not reduce the incentive to produce safe products.

## IV.

Unlike Justice Morse, I reach this conclusion as part of the development of the common law of products liability in this state and not because of the Vermont comparative negligence statute, 12 V.S.A. § 1036. The statute applies only to "an action . . . to recover damages for *negligence*." (Emphasis added.) We must presume that the Legislature intended the plain meaning of the statutory language. See *Bisson v. Ward*, 160 Vt. 343, 348, 628 A.2d 1256, 1260 (1993); *Armstrong v. Cione*, 738 P.2d 79, 82 (Haw. 1987) (plain meaning of words shows Legislature did not intend to include actions based on strict liability within coverage of comparative negligence statute).

---

[4] Requiring a plaintiff to prove that the product is defective is also inconsistent with the goal of spreading the cost of injuries. *Thibault*, 395 A.2d at 845. The purpose of strict products liability is, however, to hold the manufacturer responsible for casting a defective product into the market, not for user negligence, even if such negligence results in injury.

The wording covers actions based on negligence, but not on strict liability. The majority of courts confronting this question have reached the same conclusion. See, e.g., *Armstrong*, 738 P.2d at 82; *Thibault*, 395 A.2d at 848; *Day*, 345 N.W.2d at 354; *Duncan*, 665 S.W.2d at 426; *Mulherin*, 628 P.2d at 1303.

Nor can I agree that the statute reaches some kinds of products liability actions and not others. Nothing in our case law suggests that some products liability cases are based on negligence principles and others are not. Section 402A(2)(a) of the Restatement (Second) provides that a seller of a defective product is liable although "the seller has exercised all possible care in the preparation and sale of his product." Relying on § 402A, we have squarely held that "[l]ack of negligence . . . does not bar the liability." *Kinney*, 134 Vt. at 574, 367 A.2d at 679.

Even though the comparative negligence statute does not apply, we could construct a comparable causation rule that would mirror its terms. In this case, the main significance of such a rule is that plaintiffs could not recover if the causal effect of the negligence of Bruce Webb was greater than the causal effect of the liability of defendant. Using this test, Justice Morse would hold that, as a matter of law, a majority of plaintiffs' damages were caused by the negligence of Bruce Webb so that plaintiffs cannot recover at all.

I do not subscribe to the "half-or-nothing" framework of § 1036 for products liability cases. The rule is inconsistent with the policy of ensuring that manufacturers bear the cost of casting defective products into the market. The manufacturer must remain responsible for damages resulting from the defect, regardless of the extent to which other factors contributed to the injuries. See *Day*, 345 N.W.2d at 357 ("half or nothing" policy of comparative negligence statute is incompatible with basic concepts of strict liability); see also *Butaud*, 555 P.2d at 45-46 (pure comparative liability is fair method to apportion liability in strict products liability cases); *Armstrong*, 738 P.2d at 82-83 (pure comparative principles necessary to prevent all-or-nothing decisions and to create economic incentives for safer products); *Duncan*, 665 S.W.2d at 429 (policies underlying strict liability best served by pure comparison); Schwartz, *supra*, at 179 (pure comparative principles should apply to further policy of risk distribution). I would allow plaintiffs to recover irrespective of the extent to which Bruce Webb's negligence contributed to his injuries; of course, the amount of recovery would be reduced to reflect the contribution of this negligence.

The dissent characterizes the adoption of comparative causation as a major step toward abolishing the doctrine of strict products liability. I find this conclusion to be greatly exaggerated. I doubt that a balanced and properly designed rule on comparative causation will significantly reduce the incentive for manufacturers to produce safe products; indeed, it may increase the incentive. The posture of this case prevents us from fashioning a fair and balanced rule that eliminates or reduces the adverse side-effects claimed by the dissent. The first question before us is whether comparative causation can *ever* apply in a products liability case, and we have divided on that question. I emphasize the narrowness of the question because much of the criticism of comparative causation rules applies to rules I would not adopt.

If comparative principles ever apply in a strict liability case, they should apply here. The jury could find that a number of Bruce Webb's actions or omissions reflected lack of due care for his safety. Some of these actions or omissions do not involve the condition of the tractor and are not related to plaintiffs' liability theory. For example, irrespective of what lighting was available or in use, the jury could find that Bruce Webb was negligent in riding on the draw bar and covering up a reflector and an amber light while the tractor was being operated on a highway. On remand, I would allow at least that determination.

*Reversed and remanded.*

**Morse, J.,** concurring. I agree with Justice Dooley that principles of comparative fault should apply to some products liability claims. We disagree, however, on the basis for comparative fault. Justice Dooley believes we should reverse and remand this case for a third trial because the trial judge failed to instruct the jury on comparative causation. I would reverse because on the facts no reasonable juror could find Bruce Webb less than fifty-one percent responsible for the accident, and thus, under 12 V.S.A. § 1036 (comparative negligence), judgment would have been entered for defendant.

No matter how the claim is labeled, the 402A claim here is essentially a negligence claim that defendant did not design the tractor carefully enough or warn plaintiff reasonably of the dangers. In any products liability design/warning case, ever since the doctrine was first formulated, the plaintiff has been required to prove that the product was negligently designed or negligently warned. Accordingly, it follows that 12 V.S.A. § 1036, our comparative negligence statute, should control. Section 1036 provides in part:

> Contributory negligence shall not bar recovery *in an action* by any plaintiff, or his legal representative, *to recover damages for negligence* resulting in death, personal injury or property damage, if the negligence was not greater than the causal total negligence of the defendant or defendants, but the damage shall be diminished by general verdict in proportion to the amount of negligence attributed to the plaintiff.

(Emphasis added.)

The plain language of the statute indicates that it applies in an action to recover damages for negligence. Because plaintiffs' defective design/warning claim is a negligence claim, § 1036 must therefore apply. Other courts have similarly applied their comparative negligence statutes to such claims. See, e.g., *Suter v. San Angelo Foundry & Machine Co.*, 406 A.2d 140, 146-47 (N.J. 1979) (because notion of fault is "inherent in the concept of strict liability," comparative negligence statute is applicable to strict products liability actions); *Dippel v. Sciano*, 155 N.W.2d 55, 64-65 (Wis. 1967) (strict products liability is negligence per se; therefore, comparative negligence statute applies).

Comparative fault, it seems to me, is the fairest way to resolve the parties' varying appreciation of the dangerousness of a product. If a product is obviously dangerous in the sense that a reasonable person would consider it dangerous (a bowling ball dropped on one's foot, for example), there should be no liability. For a defendant to be held liable, the risk should be obscure to the expected user. Graduations in expectations of risk can be reconciled on a case-by-case basis in comparing the unreasonably faulty design and less-than-careful use of a product under the varying circumstances. The doctrine of comparative negligence allows for such flexibility.

If there were such a thing as true "strict liability" whereby a manufacturer is liable for injury no matter how carefully the product is designed and warned for safety, I would agree the comparative negligence statute should not apply. (I have not as yet come across such a cause of action in the product design/warning field). When a product is defective in the sense it did not turn out as it was intended in the manufacturing process, the manufacturer should be strictly liable for proximate resulting harm. But that is not this case.

Under § 1036, recovery is barred if a plaintiff's total negligence is greater than the negligence of the defendant. Applying § 1036 in this case, I would reverse the jury verdict and enter judgment for

defendant because the evidence showed as a matter of law that Bruce Webb's negligence was greater than the negligence of defendant due to defective design or inadequate warnings. Neither the lighting system of the tractor nor the allegedly inadequate warning against use of the field light on a public road was a significant cause of the accident. Rather, Webb failed to maintain the flashing lights, and consequently, could not mind the warning decal on the tractor to "use flashing warning lights at all times on public roads." Had the flashing lights worked and been turned on as instructed by the warning, the field light would not have operated. Any deficiency in the lighting system of the tractor was exceedingly minor when compared with plaintiff's failure to keep the flashing lights in working order. Moreover, plaintiff aggravated the situation further by riding on the draw bar and blocking view of the reflective slow-moving-vehicle triangle and the single flashing amber light that may have been working. A reasonable juror would have to conclude that the major fault and cause for the accident was attributable to plaintiff.

Accordingly, I would reverse.

**Peck, J.,** Specially Assigned, concurring in the mandate. I concur, albeit somewhat reluctantly, in a mandate to reverse and remand for a new trial. I do so only because the failure of a majority in this case would in all probability result in an affirmance based solely on a technicality rather than on the merits of either party on appeal. The retrial, if any, should use comparative causation principles. While stalemates do occur, I believe appellate courts should do everything within reason to avoid such results. Not only do they have an adverse effect on the public confidence in the courts, they inevitably deny to one of the parties the full benefit of the judicial appellate process through no fault of that party.

I agree also with the other concurring opinion that "no reasonable juror could find Bruce Webb less than fifty-one percent responsible for the accident." 166 Vt. at 134, 692 A.2d at 351. However, in view of my own sentiment that judgment for defendant should be entered here, it becomes unnecessary for me to explore this further. It is irrelevant to the disposition I would have preferred.

In my judgment the evidence was insufficient, as a matter of law, for the jury to find that defendant's tractor was defective or that its warnings were inadequate. Were I in a position to do so, I would reverse the verdict for plaintiffs and enter judgment here for defendant. I would not reach the issues regarding comparative fault.

In my view, there was nothing wrong with the tractor, based on the evidence at least, as a matter of law. Plaintiffs failed to show any defect or inadequate warning. Although many farmers may drive their tractors on public roads, this is not their primary or intended use. Tractors are not designed for travel on public roads, as are automobiles, trucks, buses, motorcycles, and the like. Knowing that some consumers may nonetheless operate tractors on public roads, as for instance between one farm field and another, defendant affixed a cautionary decal on the tractor directing operators to "use flashing warning lights at all times on public roads."

Plaintiff Bruce Webb failed to use the flashing lights when on a public road. It makes no difference whether plaintiff failed to maintain the lights or failed to turn them on; failure to use the flashing lights on the public road was plaintiff's fault, not defendant's. The risk was obvious and the warning adequate, if necessary at all. No design defect or failure to warn caused this accident. See *Webb v. Navistar Int'l Transp.*, No. 91-384, slip op. at 2 (Vt. July 1, 1992) (*Webb I*) (unpub. mem.) ("A product that bears a warning and is safe for its intended purpose if the warning is followed is not in defective condition."); Restatement (Second) of Torts § 402A cmt. j (1965) (same). I conclude that the evidence, even viewed in the light most favorable to plaintiffs, is insufficient to support plaintiffs' claim. *McGee Constr. Co. v. Neshobe Dev., Inc.*, 156 Vt. 550, 556, 594 A.2d 415, 418 (1991) (we consider evidence in light most favorable to jury verdict).

**Johnson, J.,** dissenting. Although there are three votes in this Court for reversal of the judgment below, the differences among the members of the majority are such that there is no direction to the trial court on how to proceed. Justice Dooley would remand with instructions to charge the jury on a theory of "pure" comparison; Justice Morse would remand with instructions to charge on the theory of comparative negligence (sometimes characterized as "half or nothing") embodied in 12 V.S.A. § 1036; and Justice Peck would reverse because no form of comparative negligence was charged, but without any direction on precisely what or how to compare. Thus, even though the next unfortunate trial judge will have been told to apply some form of comparative negligence doctrine, he or she will not know which of several versions should be applied, and the use of any of them will inevitably result in reversal in this Court if another appeal is taken.

To remand this case for a third trial transforms the litigants into rats in a maze, compelled to run indefinitely between a place called "trial," where one or the other would prevail, and a place called "appeal," where the party prevailing at "trial" would inevitably be defeated. In other words, unless this case is settled, or one of the parties becomes too exhausted to continue, the case will proceed indefinitely. The only honest course is to acknowledge that the Court is stalemated on this issue, summarily affirm on that basis, and leave the issue for another day or for resolution by the legislature. Cf. *Suhor v. Gusse*, 377 So. 2d 1259, 1262-63 (La. Ct. App. 1979) (on rehearing) (where two justices would affirm jury verdict, two would reverse, and one would remand, judgment is affirmed for lack of majority to change it). The worst we can do is force these parties to stay in a litigation maze with no exit.

Justice Dooley's opinion asserts that if I "would accept that comparative causation has now become the rule in products liability cases in Vermont, and participate in an implementation design to guide future cases, the trial judge . . . might know exactly what to do on remand." 166 Vt. at 122, 692 A.2d at 344. I disagree. Without concurrence on the details of implementation, the doctrine of comparative negligence is meaningless, indeed, nonexistent. It would be as if one were to say that the state recognizes the doctrine of divorce, when there was no agreement as to what constituted the grounds therefor. Acceptance of the general concept is by itself insufficient to let trial judges know what to do. Thus, even if Justice Gibson and I agreed that some form of comparative negligence should be applied, there would be no majority position unless the two of us were also in agreement on what variant of the doctrine to apply, and our position coincided with that of either Justice Morse or Justice Dooley.[1]

Forced to this disposition, I state my views on the substantive issues.

## I.

Justice Dooley and Justice Morse would hold, under varying circumstances, that when a plaintiff alleges injury caused by a defective product, the defendant that produced or distributed the product can reduce or eliminate its liability for damages by showing

---

[1] Of course, the dissenters are under no compulsion to concur, either on the general doctrine or on any of its many variations. This is a case of first impression in this Court. We are not, therefore, bound by principles of stare decisis here.

that the plaintiff's negligent conduct was a contributing cause of the injury. I believe that such a holding would take a major step toward abolition of the doctrine of strict products liability by undermining the principal purpose of the doctrine — to promote the manufacture and distribution of safe products. I see no justification in law, policy, or the facts of this case to extend the doctrine of comparative fault to strict products liability actions.[2]

Notwithstanding assertions to the contrary in Justice Dooley's opinion, my position is followed by a significant number of jurisdictions. 1 A. Best, Comparative Negligence: Law and Practice § 9.20[6], at 41-42 (1996) (significant number of jurisdictions continue to reject or limit application of comparative negligence in strict products liability actions); Annotation, *Applicability of Comparative Negligence Doctrine to Actions Based on Strict Liability in Tort*, 9 A.L.R.4th 633, 638-41 (1981) (reviewing cases in which courts have refused to compare fault); see, e.g., *Kinard v. Coats Co.*, 553 P.2d 835, 837 (Colo. Ct. App. 1976) (better-reasoned position is that comparative negligence has no application to products liability actions); *Lippard v. Houdaille Indus., Inc.*, 715 S.W.2d 491, 493 (Mo. 1986) (en banc) (refusing to apply comparative fault principles to products liability actions); *Bowling v. Heil Co.*, 511 N.E.2d 373, 380 (Ohio 1987) (better-reasoned decisions are those that have declined to inject plaintiff's negligence into law of products liability); *Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 637 A.2d 603, 605-06 (Pa. 1993) (agreeing with cited jurisdictions refusing to extend negligence concepts to products liability actions).[3]

Further, although a majority of jurisdictions compare fault in products liability actions, that majority is hopelessly divided on when and what to compare and how to implement the comparison. See M. Roszkowski & R. Prentice, *Reconciling Comparative Negligence and*

---

[2] For the reasons stated by Justice Dooley, I oppose Justice Morse's position, which would unabashedly return strict products liability actions to the realm of negligence law, at least with respect to warning/design cases.

[3] Justice Dooley points out that the tentative draft of the Restatement (Third) of Torts provides for apportioning liability between the plaintiff and the manufacturer or seller. See Restatement (Third) of Torts: Products Liability § 7 (Tentative Draft No. 1, 1994). These changes have been roundly criticized, however. See generally *A Symposium on the ALI's Proposed Restatement (Third) of Torts: Products Liability*, 61 Tenn. L. Rev. 1043 (1994) (collection of twelve articles written in response to proposed changes in § 402A); M. Davis, *Individual and Institutional Responsibility: A Vision for Comparative Fault in Products Liability*, 39 Vill. L. Rev. 281, 342-44 (1994); H. Latin, *The Preliminary Draft of a Proposed Restatement (Third) of Torts: Products Liability — Letter*, 15 J. Prod. & Tox. Liab. 169, 179-82 (1993).

*Strict Liability: A Public Policy Analysis*, 33 St. Louis U. L.J. 19, 40-47 (1988) (discussing various approaches taken by jurisdictions that compare fault in products liability actions). Some courts compare any and every type of contributory negligence, other courts compare only contributory negligence that rises to the level of assumption of risk or unforeseeable misuse, and still others compare all types of contributory negligence except when the negligence can be labeled as a failure to discover or guard against the risk posed by the defective product. See *id.* at 47; *Lippard*, 715 S.W.2d at 493 n.2; W. McNichols, *The Relevance of the Plaintiff's Misconduct in Strict Tort Products Liability, the Advent of Comparative Responsibility, and the Proposed Restatement (Third) of Torts*, 47 Okla. L. Rev. 201, 253-65 (1994). As I point out below, these attempts to label types of contributory negligence to determine what conduct may be compared complicate the law and detract from the principal issues that need to be resolved in products liability actions. Courts also differ, as we do here, on whether to apply a "pure" form of comparison, under which all plaintiffs less than 100% at fault may recover damages to the extent that defendants are at fault, or a "modified" form of comparison, under which plaintiffs are barred from any recovery if their negligence is equal to or greater than that of defendants. McNichols, *supra*, at 244-46. Courts that compare are also splintered on what to compare — causation, fault, or some other factor. *Id.* at 246-52.

## II.

A closer examination of the facts will be helpful before I detail the reasoning behind my position against comparing fault in products liability actions. On a wet, drizzly November night, Bruce Webb was awakened with the news that some of his cows might be out of the pasture. His father drove the tractor onto the highway in search of the cows while Bruce Webb stood on the tractor's draw bar. En route, the tractor was struck in the rear by a car whose driver was allegedly intoxicated. As a result of the accident, Bruce Webb was permanently disabled.

The evidence at trial indicated that the manufacturer of the tractor, Navistar International Transportation Corporation, knew as early as the 1970s that white field lights on tractors were dangerous if used on the road, and that they were capable of causing precisely the kind of accident that occurred here — a rear-end collision. A retired product-performance engineer for Navistar, John Hassler, testified that it was "general knowledge" in the company, prior to 1978, that white lights

on the back of tractors could be hazardous if used in road operation. Plaintiffs' expert, John Sevart, confirmed that it was general knowledge in the industry that the risk of rear-end collisions between vehicles and tractors on roads should be considered in designing lighting systems for tractors. Sevart referred to technical literature from the 1970s detailing numerous safety studies. Different findings emerged from different studies, but one of the frequent factors identified in nighttime rear-end collisions was poor lighting. In Sevart's opinion, there were two problems. First, the speed differential between cars and tractors caused errors in judging closure rates, and second, use of single white field lights was confusing to drivers and caused misidentification of the vehicle ahead.

In sharp contrast, the evidence indicated that Webb, and farmers in general, were unaware of the danger posed by using the tractor's field light on the highway at night. Numerous witnesses testified that it was common practice for experienced farmers to use field lights in such a manner. Webb too testified at trial that it had not occurred to him that driving the tractor on the highway at night while using the rear field light was a hazard. He indicated that while travelling on the highway he employed both the headlights and the rear field light on the rationale that more light was better than less light. The owner's manual contained a warning against using the white field light on the highway. Neither of the Webbs had read it. It is found on page 55 of the manual, while instructions for the safe operation of the tractor are found on pages 3 and 4. In a hurry, and oblivious to the danger posed by the field light, Webb and his father headed down the road looking for their cows with the white light shining from the rear of the tractor. The driver whose car struck the tractor testified that he believed the white light mounted on the left rear bumper was the headlight of an approaching "one-eyed" car. While defendant argues that the driver was not credible, the jury apparently felt otherwise.

In sum, the evidence showed that the accident was predictable to the manufacturer of the defective product, but was not foreseen by the consumer. Webb's conduct may have been negligent, but if Navistar failed to provide adequate warnings of the tractor's dangerous features, it is my view that Webb's ordinary negligence should not lessen the liability of Navistar, which was in a better position to avoid the harm.

## III.

The principal argument for comparing plaintiffs' negligence in products liability actions is couched in terms of fairness. It is fairer to

compare, so the argument goes, because the comparison avoids imposing upon manufacturers and careful consumers the costs caused by negligent consumers. But the real issue is whether a higher value should be placed on the deterrence of product defects than is placed on laying the correct amount of blame on the particular actors involved in an accident that was statistically predictable. When this Court adopted the doctrine of strict liability for defective products more than twenty-one years ago, see *Zaleskie v. Joyce*, 133 Vt. 150, 155, 333 A.2d 110, 114 (1975), it chose deterrence over fault. Neither defendant nor the amicus manufacturers' association has cited any occurrence in the last twenty years that has rendered that judgment obsolete.

The ultimate goal of the doctrine of strict products liability is to protect consumers from unsafe products. See *Smith v. Smith*, 278 N.W.2d 155, 160 (S.D. 1979) (principal purpose behind strict products liability is to protect public). The doctrine's most direct means of achieving that goal is to relieve plaintiffs of proving that the defendant was negligent or that there was privity of contract between the parties. Relieving plaintiffs of this burden of proof focuses products liability cases on the product rather than on the conduct of the parties. In contrast, allowing an allocation of damages based on the plaintiff's conduct will have the opposite effect. Because imperfect user behavior is a common, indeed an inevitable, contributor to most product-related accidents, every products liability case hereafter will center around the behavior of the parties. See *Daly v. General Motors Corp.*, 575 P.2d 1162, 1183 (Cal. 1978) (Mosk, J., dissenting) ("We can be as certain as tomorrow's daylight that every defendant charged with marketing a defective product will hereafter assert that the injured plaintiff did something, anything, that conceivably could be deemed contributorily negligent . . . ."). Defendants will emphasize the plaintiff's fault in the hopes of reducing their liability.[4] Consequently, the plaintiff's conduct will be elevated while the defect is downplayed, forcing the plaintiff to prove, once again, that the defendant was negligent to counterbalance the defendant's allegations of fault. 1 Best, *supra*, § 9.30[5][b], at 71; Roszkowski & Prentice, *supra*, at 51-52.

---

[4]Because of the increased emphasis on the element of fault, the jury may give unwarranted weight to the plaintiff's "fault" when comparing it to the defendant's "no-fault" conduct. Roszkowski & Prentice, *supra*, at 51-52; see *Daly v. General Motors Corp.*, 575 P.2d 1162, 1183 (Cal. 1978) (Mosk, J., dissenting) (however delicately described, comparing plaintiff's negligence in products liability cases elevates conduct of injured consumer to issue of equal significance with product defect).

Some courts have reasoned that comparing negligence does not greatly affect the incentive to produce safe products because a manufacturer's liability is reduced only to the extent that the trier of fact finds that the user's conduct contributed to the injury, and manufacturers are not able to predict in any given case whether contributory negligence will reduce the plaintiff's judgment. E.g., *Daly*, 575 P.2d at 1169. This reasoning does not hold up under scrutiny.

Although manufacturers may not be able to anticipate careless behavior in any given case, they know with virtual certainty that a product will cause a calculable number of accidents, and they will often be able to predict the extent of plaintiffs' negligence by evaluating accidents on a statistical basis. H. Latin, *The Preliminary Draft of a Proposed Restatement (Third) of Torts: Products Liability — Letter*, 15 J. Prod. & Tox. Liab. 169, 179 (1993); D. Sobelsohn, *Comparing Fault*, 60 Ind. L.J. 413, 438 (1985). From their calculations, manufacturers can approximate the total liability exposure that those accidents will create, and will then incur increased production costs for safety features only when it makes economic sense to do so. In this way, "the effect of reductions in liability costs as a result of comparative apportionment can make a major difference on the manufacturer's marginal investments in safety." Latin, *supra*, at 179.

To the extent that product liability would be reduced by comparing plaintiffs' negligence, the incentive to produce safe products would also be reduced. Sobelsohn, *supra*, at 438; see *Daly*, 575 P.2d at 1186 (Mosk, J., dissenting) (motivation to avoid producing defective products increases in direct relation to size of potential damage award); M. Davis, *Individual and Institutional Responsibility: A Vision for Comparative Fault in Products Liability*, 39 Vill. L. Rev. 281, 344 (1994) (if manufacturers need only compensate those injured during careful use, losses resulting from defective product will never be fully considered in evaluating needed investment in safety). For example, if a particular feature of a product results in accidents costing $1 million, and redesign of the product to eliminate the dangerous feature would cost $900,000, the manufacturer would not have any incentive to redesign the product if the manufacturer could predict that a certain percentage of consumers would negligently contribute to their injuries while using the product, thereby making it cheaper for the manufacturer to pay tort claims rather than redesign the defective product. Sobelsohn, *supra*, at 438.

We can be certain that, based on statistical accident data and marketing analyses, manufacturers make conscious, calculated

choices regarding the safety of their products, choices that are affected by legal principles. If the law provides an economic incentive for a manufacturer to add safety features to a particular product, thousands of people may be spared injury. If, on the other hand, reduced tort damages from comparing plaintiffs' negligence convinces a manufacturer that it would not make economic sense to add safety features to its product, many consumers, including careful ones, may later be injured by the defective product. Assuming that they are able to fend off a defendant's claims of comparative negligence, those careful consumers may obtain full monetary damages, but at the expense of their health or even their lives. This is *not* a fair result.

Further, applying comparative fault principles in products liability actions cannot be expected to have a deterrent effect on plaintiffs' negligence, any more than allowing plaintiffs full recovery for damages caused by defective products would encourage people to be more negligent. Latin, *supra*, at 179 ("[T]here is no reason to think the prospect of apportionment of damages will have any appreciable effect on the degree of care users exercise."); see Sobelsohn, *supra*, at 440 (considering that risk of injury rests on many contingencies, and that victim is probably covered by insurance and knows next to nothing about tort law, there is room for skepticism that adoption of comparative fault will induce consumers to handle products with greater care). People already have powerful, inherent, nonlegal incentives to avoid injuries, such as fear of pain and death. If the threat of injury or death does not deter carelessness, a change in the doctrine of strict liability certainly will not.

But there is another important reason why I am persuaded that it is unfair to use comparative principles in strict liability cases. The victim's negligence may be the result of a moment's inattention to some detail, carelessness in a time of crisis, or miscalculation as to the danger involved in using a product a certain way. These types of ordinary negligence, to which all of us fall prey at times, cannot be regarded as equivalent to the manufacturer's responsibility to design safe products and warn the public of dangers that accompany use of their products. See Davis, *supra*, at 348-50 (careless conduct not grounded on voluntary assumption of known risk should not be compared to manufacturer's failed responsibility to design safe product or adequately inform user of product's defects).

This is where the superficial appeal to fairness falls apart. As a general proposition, we can all agree that each person should bear

responsibility for his or her own conduct. It is for this reason that comparative negligence has been accepted as fair in other contexts. But the doctrine of comparative negligence arose in cases where the fault of the parties was of a similar order — carelessness versus carelessness. In strict products liability cases, however, we have fault of very different kinds. The garden-variety carelessness that may contribute to an injury in the use of a product is simply not of the same magnitude as the design, manufacture and release into commerce of a dangerously defective product or a product whose dangers are hidden by inadequate warnings. It is *not* fair, therefore, to treat the two as equivalent.

In an effort to strengthen the argument that comparing plaintiffs' negligence is somehow fairer, Justice Dooley's opinion repeatedly labels current products liability law under the Restatement (Second) of Torts § 402A as the "all or nothing" approach. Under this approach, plaintiffs' contributory negligence generally cannot be compared with the product defect to apportion liability, but "assumption of risk" provides a complete defense. Because Justice Dooley believes that triers of fact will find it difficult to distinguish assumption-of-risk conduct from ordinary contributory negligence, he concludes that some plaintiffs who should be barred from recovery will actually obtain a windfall, while others who are only contributorily negligent may be unfairly deprived of any recovery. According to Justice Dooley, comparing negligence is fairer because there is no need to draw "shadowy lines" between assumption of risk and contributory negligence if all defenses constitute a basis for apportioning liability.

I find these arguments unpersuasive for two reasons. First, the assumption-of-risk defense has not proved to be an unfair obstacle to consumer recovery. See generally 1 Best, *supra*, at § 9.40[3][a], at 81-82. (stating elements of assumption-of-risk defense and citing cases in which defense has been rejected). Assumption of risk applies in very limited circumstances in which the consumer's knowledge or conduct has placed him in a position of equality with the manufacturer. The plaintiff must voluntarily encounter the risk despite being subjectively aware of the existence of the risk *and* appreciating the extent of the danger. *Id.*

Plaintiffs who voluntarily assume a known risk *should*, in my judgment, be barred from recovery. Limiting the assumption-of-risk defense tends to penalize legitimate commercial interests unfairly rather than promote fairness to consumers. Justice Dooley's opinion

proclaims that comparing conduct amounting to a voluntary assumption of a known risk benefits consumers, but it undermines the doctrine of strict liability, which provides a powerful incentive for manufacturers and vendors to create and purvey only those products that are safe for everyone. In short, the majority imagines a problem negatively affecting consumers and then creates a cure far worse than the "problem" it seeks to rectify.

Second, while it may not always be easy to distinguish assumption of risk from ordinary contributory negligence, the subjective component of assumption of risk makes the defense qualitatively distinct from other forms of contributory negligence. See *id.* (plaintiff must voluntarily encounter risk despite being subjectively aware of existence of risk and appreciating extent of danger; many courts distinguish assumption of risk from contributory negligence on point that only assumption of risk involves application of subjective standard to plaintiff's conduct); see also *Zahrte v. Sturm, Ruger & Co.*, 661 P.2d 17, 18 (Mont. 1983) (subjective element of assumption of risk makes it distinct from contributory negligence); Roszkowski & Prentice, *supra*, at 82 n.306 (requirements of subjective knowledge and appreciation, plus voluntary action, render assumption of risk qualitatively different from mere plaintiff carelessness). Thus, courts and fact finders are able to distinguish between assumption of risk and contributory negligence under the § 402A approach.

On the other hand, Justice Dooley's approach would require much more difficult line-drawing. Apparently, his approach would require that the trial court instruct the jury that plaintiffs' damages could be reduced based on Webb's contributory negligence in riding on the draw bar, but not based on Webb's negligence in failing to use or maintain the tractor's taillights and flashing lights, because Webb may have maintained those lights had he been adequately warned of the danger of using the field light on the highway at night. This suggested direction to the trial court demonstrates the difficulty in drawing lines to determine when the plaintiff's contributory negligence may be compared to reduce damages in strict products liability actions. Here, had defendant adequately apprised Webb of the danger of depending on the field light while traveling on the highway at night, Webb not only may have maintained and used the tractor's reflectors and flashing lights, but he then may also have been careful, in the absence of the field light, not to ride on the tractor in a manner that would obstruct the reflectors and flashing lights. In short, all of Webb's alleged negligent conduct could be characterized as a failure

to discover or guard against the defect, or as resulting from defendant's failure to adequately warn him of the tractor's dangers. See 1 Best, *supra*, § 9.40[5][a], at 100 (phrase "failure to discover a defect or to guard against its existence" could arguably cover virtually any plaintiff conduct that led to product-related injuries); Roszkowski & Prentice, *supra*, at 67 (distinguishing "failure to discover or guard against" negligence from other forms of contributory negligence is difficult task).

I believe that the trial court should not be required to draw lines among types of contributory negligence or to allow the jury to apportion damages by comparing the plaintiff's conduct with the product defect. This does not mean that defendants cannot present evidence of plaintiffs' alleged negligent conduct, as was done in the two previous trials in the instant case, to demonstrate that the defect, if it existed at all, was not a proximate cause of the accident. See *Kinard*, 553 P.2d at 837-38, *Correia v. Firestone Tire & Rubber Co.*, 446 N.E.2d 1033, 1040 (Mass. 1983); *Lippard*, 715 S.W.2d at 493; *Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1366 (Okla. 1974).

In sum, (1) manufacturers have the opportunity to make calculated, informed choices concerning product safety; (2) economic factors and legal principles drive their decisions; (3) those decisions can affect the health and safety of thousands or even millions of people; and (4) enterprises can more easily absorb and equitably pass on to the public the costs of defective products as part of doing business. On the other hand, (1) consumers lack the expertise and information about products possessed by manufacturers; (2) liability law provides no incentive for them to be more careful; (3) their contributory negligence is foreseeable, such that its costs can be equitably spread among all product users; and (4) most importantly, their negligence is simply not equivalent in kind to the act of designing and manufacturing a defective product. For these reasons, there is nothing unfair about imposing full liability on a manufacturer who places in the stream of commerce a defective product that is a proximate cause of the plaintiff's injuries, even if the plaintiff's negligence contributed to those injuries. Products should be designed to protect not only ideal consumers, but also careless, illiterate, ignorant, and inattentive ones as well. See *Daly*, 575 P.2d at 1183 (Mosk, J., dissenting) (defective products are comparable to time bombs that maim their victims indiscriminately, whether righteous or evil, careful or careless; thus, litigation involving defective products should not be diverted to consideration of plaintiff's negligence).

## IV.

Finally, this case illustrates why purported moves toward tort "reform" must be examined critically. For the first half and more of this century, one of the major trends in the development of tort law was toward equitable sharing of the costs that are inevitable by-products of modern society. Injecting principles of comparative negligence into strict products liability actions is a regrettable departure from that trend. What in my view is an overly simplistic attempt to achieve fairness has in fact illegitimately advanced the interests of a small segment of society over the interests of the whole. See Davis, *supra*, at 342-44; J. Vargo, *The Emperor's New Clothes: The American Law Institute Adorns a "New Cloth" for Section 402A Products Liability Design Defects — A Survey of the States Reveals a Different Weave*, 26 U. Mem. L. Rev. 493, 509-10, 515 (1996); see generally *A Symposium on the ALI's Proposed Restatement (Third) of Torts: Products Liability*, 61 Tenn. L. Rev. 1043 (1994).

I would affirm the judgment below. I am authorized to say that Justice Gibson joins in my opinion.