**GENERAL MOTORS CORPORATION and Lawrence Marshall Chevrolet–Oldsmobile, Inc., Appellants,**

v.

**Maria Del Carmen SAENZ, Individually and in Her Capacity As the Personal Representative of the Estate of Abel Lee Sanchez, Deceased; Connie W. Creel, Individually and As Next Friend of A.J. Sanchez, a Minor Child; and A.L. Sanchez, Jr., Individually and As Representative of the Estate of Abel L. Sanchez, Deceased, Appellees.**

No. 04–96–00303–CV.

Court of Appeals of Texas, San Antonio.

Nov. 19, 1997.

Dissenting Opinion of Justice Green, Feb. 11, 1998.

Rehearing Overruled March 30, 1998.

John R. Trigg, John H. Feiner, Parcel, Mauro, Hultin & Spaanstra, P.C., Denver, CO, Jose E. Garcia, William L. Hubbard, Garcia & Ramirez, McAllen, Ruth Greenfield Malinas, Ball & Weed, P.C., San Antonio,

David M. Heilbron, Leslie G. Landau, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for Appellants.

Russell H. McMains, Law Offices of Russell H. McMains, Corpus Christi, Stacy Keaton, Law Offices of Russell H. McMains, Houston, Mark A. Cantu, Law Office of Mark A. Cantu, McAllen, Guy H. Allison, Allison & Huerta, Corpus Christi, Rebecca E. Hamilton, Todd W. White, White, White & Hamilton, P.C., Rockwall, for Appellees.

HARDBERGER, C.J., and STONE and GREEN, JJ.

## OPINION

HARDBERGER, Chief Justice.

## INTRODUCTION

This negligence and strict liability lawsuit arose when a 1990 Chevrolet pick-up, with no one at the wheel, backed up and caught the owner, Lee (Pookey) Sanchez, between the pick-up and an iron gate. Crushed between the two, with a broken arm and leg, and a deeply cut arm, Sanchez hung "like a butchered cow" until he bled to death. The case was well tried by both sides and correctly submitted to the jury. The jury found both General Motors Corporation (G.M.) and Sanchez equally negligent. It also found G.M. guilty of both a design and marketing defect. Damages were assessed in the amount of $4 million in compensatory damages (spread between Sanchez's son, his common-law wife, his mother and father, and his estate), and $4.5 million in punitive damages. Not surprisingly, both sides were unhappy with the jury findings that did not favor them, and the trial court ultimately set aside the comparative negligence finding against Sanchez. Judgment was then entered for $8.5 million against G.M.

G.M. appeals, claiming in three points of error that: (1) there was no evidence to support the jury's findings of negligence, defective design, and a failure to warn, (2) there was no evidence of gross negligence to support the jury's award of punitive damages, and (3) the trial court erred in setting aside the jury's comparative fault finding against Sanchez.

We affirm.

## SUMMARY OF FACTS

Lee Sanchez, forty-seven, went to feed his cattle on March 15, 1993 at his father's ranch. He was driving a 1990 Chevrolet pick-up that belonged to him. He was never seen alive again. He was found the next day crushed between the leading edge of a pipe gate and the hinge area of the open door of his pick-up. He had bled to death from his injuries after a desperate, but futile, struggle to free himself. Unbeknownst to Sanchez when he exited his pick-up that day, the truck's gear lever was destined for Reverse. No one witnessed the death, and there will never be 100% certainty as to why the pick-up went into Reverse. The plaintiffs' explanation, accepted by the jury, was that after Sanchez drove through the gate of the corral, he attempted to put the gear lever in Park, but by mistake put the lever between Park and Reverse, which is a never-never land that engineers call "hydraulic neutral." With the gear lever in this position, the lever can jump into Reverse and the pick-up can start backing up with no one at the wheel. When this happens, there is a short pause between the gear lever being released by the driver and the movement into Reverse. This pause allows the unsuspecting driver to get out of the vehicle and put himself in harm's way. Sanchez was found pinned between the partially opened gate and the hinged area of the open door of the pick-up. As it was his right side that was pinned in the driver's door, there was evidence that he had exited the pick-up already, and at the time of impact was either trying to get back in, or was taken unaware while closing the gate.

G.M.'s version of the accident was that Sanchez had left the vehicle in Reverse, either on purpose to block the gate to prevent cattle from escaping, or unintentionally, simply thinking he had put the gear lever in Park, but actually leaving it in Reverse. Either way, G.M. claimed, Sanchez was the sole cause of his misfortune. Had he put the lever properly in Park, the pick-up would not have moved, and had he put the parking

brake on, the vehicle would not have moved even if the gear lever was left in Reverse. Moreover, if he had killed the engine and taken out the keys, the accident would not have happened.

Both sides were well-armed with experts, and while there was much disagreement, each side had made some concessions by trial's end. The plaintiffs' experts admitted that had the pick-up been left fully in Park, its gear lever could not jump anywhere. It would stay in Park. Likewise, they admitted that the parking brake, had it been set, would have kept the vehicle in one spot. Finally, they conceded that the vehicle could not have jumped into Reverse if the motor had not been left running and the keys had been taken out of the ignition.

G.M.'s experts, on the other hand, admitted that "hydraulic neutral" was a real term, and that it was possible for a pick-up gearshift lever left between Park and Reverse to move into Reverse after a pause. They also admitted that the possibility of this happening had been known for many years by the automotive industry. They said, however, that it was extremely rare. It was also G.M.'s position that its transmission, used in this pick-up, was second to none in safety and was as safe or safer than those used by Ford and Chrysler.

Sanchez is survived by a brain-damaged son, A.J. Sanchez, III; his common-law wife, Candy; and his father and mother, Abel and Jessie Sanchez. All are parties in this lawsuit.

### POINT OF ERROR ONE

 In its first point of error, G.M. claims that there is no evidence that Sanchez's injuries were caused by a negligent or defective design in the pick-up, or by a failure to warn. In reviewing a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988), *rev'd on other grounds, Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203 (1996); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We will uphold the decision of the trier of fact unless the evidence offered to prove a vital fact is so weak as to create a mere surmise or suspicion of its existence, and is no more than a scintilla. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). When reasonable minds may reach differing conclusions as to a crucial fact based on the evidence presented, the evidence is more than a scintilla and the no-evidence challenge should be overruled. *See Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 459 (Tex.1992). In sum, if there is any probative evidence to support the jury's finding, we must overrule the point of error and uphold the finding. *See Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989).

### Negligence and Defective Design

 The jury found G.M. guilty of negligence and concluded that there was a design and marketing defect in the vehicle. Negligence and strict liability have always had overlapping elements, especially in matters of proof. Negligence requires foreseeability though. Strict liability does not. As our Texas Supreme Court has noted:

> The care taken by the supplier of a product in its preparation, manufacture, or sale, is not a consideration in strict liability; this is, however, the ultimate question in a negligence action. Strict liability looks at the product itself and determines if it is defective. Negligence looks at the acts of the manufacturer and determines if it exercised ordinary care in design and production.

*Gonzales v. Caterpillar Tractor Co.,* 571 S.W.2d 867, 871 (Tex.1978). The building blocks of negligence are (1) duty, (2) breach of that duty, and (3) injury as a result of the breach of that duty. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). Duty involves several factors, "the foremost and dominant consideration being foreseeability of the risk." *Id.* A defective design is established when the product is found to be unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use. *Turner v. General Motors Corp.,* 584 S.W.2d 844, 847 n. 1 (Tex.1979). While foreseeability is not required for strict liability, if there is foreseeability of unreason-

able dangerousness, the evidence, if believed, serves both theories of recovery. It did so in this case.

■ With regard to foreseeability, the jury heard and believed much credible evidence at trial. First, the jury was told that the automotive industry had known since the late 1960s of the problem that can occur when a car's gearshift lever is left in the middle ground between Park and Reverse. This problem is "potentially a very dangerous situation." The danger is that a car can downshift into Reverse on its own. This dangerous position is even more dangerous if someone or something jars the steering wheel, either accidentally or on purpose, such as by flipping up the steering wheel for ease of entry or exit. There is a pause of about two seconds before the vehicle starts backing up, setting up a scenario for possible serious bodily injury or death. The jury also witnessed one expert's video demonstration showing that this happened four out of six times. Another expert testified he could make the car he tested jump from hydraulic neutral into Reverse anytime he wanted to. In addition to general knowledge of the problem in the industry, there was also specific evidence that G.M. was aware of the problem in 1979, and that by 1990, G.M. had proposed a patent to deal with the problem.

How often G.M. cars experience this undesired and dangerous downshifting was vigorously disputed. The plaintiffs claimed it was an all-too-common occurrence. One expert said he had been involved in "nearly 500 of these cases." This expert, Simon Tamny, a mechanical engineer, testified he had just returned from testifying in California where a man was injured upon exiting a 1988 Sierra pickup, made by G.M., with the same linkage and transmission. One of G.M.'s experts, Dr. Juan Herrera, admitted that he could put the subject vehicle into hydraulic neutral every time he tried. At least some of the time, this maneuver can result in the car shifting itself into Reverse on its own. By the end of the trial, there was ample evidence that such a thing could happen.

G.M., through its experts, offered testimony that a jump into Reverse from hydraulic neutral was extremely rare. There was tes-timony that being killed by lightning or being drowned in your own bathtub was far more likely than being run over by a G.M. pick-up that had shifted itself into Reverse from hydraulic neutral. The jury had a wide selection of testimony to resolve these related questions of "foreseeability" in the negligence context, or "unreasonably dangerous" in the design-defect context. The jury chose to believe the plaintiffs' version. There was ample evidence to support the jury's findings in this regard. Had the jury chosen to believe G.M.'s experts, there would have been evidence to support such a verdict as well. But it did not.

■ The remaining question that must be resolved, though, in looking at either the negligence or strict liability findings adverse to G.M. is whether the transmission in question, the 700R4, can be made more safe. Is there a safer alternative? To put it in common sense terms, what is feasible?

> We evaluate whether a product has a design defect in light of the economic and scientific feasibility of safer alternatives.... The degree of feasibility is one factor courts weigh in balancing the utility of a product versus its risks.... However, if there are no safer alternatives, a product is not unreasonably dangerous as a matter of law.

*Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex.1995). No evidence was shown in the *Caterpillar* case of a reasonable alternative design. G.M. says the same thing is true in the instant case, and argues that *Caterpillar* should control. But we cannot agree with this. In this case, the Plaintiffs' expert offered an alternative design with sharper detents that would decrease or eliminate the transmission from moving from hydraulic neutral into Reverse. Sharpness of the detent is not an original concept, and the evidence showed that it has been the subject of experimentation and design changes by G.M., Ford, and Chrysler. Tamny testified his detent sharpness lay between that of Ford and Chrysler. He stated that his design would keep the transmission from going into Reverse accidentally. Tamny further stated that if the transmission did not go into Reverse, but stayed in hydraulic neutral,

tragedies like the one in this case would be eliminated. G.M. had contrary evidence, and asserted that its own design was superior to Tamny's. G.M. also emphasized its worldwide experience in an unfavorable comparison to Tamny. This might be a reason for the jury to believe G.M. over Tamny, but we do not think it negates his testimony. A jury might reasonably believe that Tamny's design was simply a modification of an existing automotive design, one superior to the transmission in this pick-up that had already been shown to move into Reverse accidentally under some circumstances.

G.M. vigorously cross-examined both of the plaintiffs' engineering experts. G.M. never objected to the admissibility of the evidence, however. This court is aware of the language in *Merrell Dow Pharmaceuticals v. Havner,* 953 S.W.2d 706, 712–13 (1997), stating that there may be cases in which the testimony is so unreliable that it simply is not evidence. The court, quoting itself in *E.I. du Pont de Nemours and Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995), gave "colorful examples of unreliable scientific evidence." *Havner,* 953 S.W.2d at 712. The court explained:

> [E]ven an expert with a degree should not be able to testify that the world is flat, that the moon is made of green cheese, or that the Earth is the center of the solar system. If for some reason such testimony were admitted in a trial without objection, would a reviewing court be obliged to accept it as some evidence? The answer is no.

*Id.* As stated, the court's example would be hard to argue with, even apart from the authority of the supreme court saying it. Tamny's testimony, though, can hardly be considered in the same category as the court's "green cheese" example. A more accurate criticism would be that his design is not very original, not that it is wrought with excessive creativity. He felt that if G.M. sharpened its detent systems, as did Ford and Chrysler, there would be less instances of G.M. vehicles shifting into Reverse of their own volition. He wanted to go back to a ten-thousandths point on the detent system like G.M. used previously on its power-glide transmission. Because many thousands of

cars were built in such a fashion, it can hardly be said that this is either a revolutionary idea, or an unfeasible one. It could be argued that Tamny's design is not an improvement and, in fact, is regressive. G.M. made such arguments, and had evidence, if believed, to support its testimony. In the end, there was simply conflicting evidence among engineering experts as to whether the design in this G.M. pick-up was defective or whether the pick-up was already as safe as it could practically be made.

*Havner* and its expert testimony dispute is not comparable to this suit. First, the defendants in *Havner* did object to the scientific reliability of the plaintiff's experts, both in pre-trial motions in limine and at the time of admission. See *id.* at 709–10. More importantly, though, *Havner* involved the uncertain effects of Bendectin, which had a long litigation history in other jurisdictions before it came before our supreme court. *See id.* at 709–10. "To date, no plaintiff has ultimately prevailed in federal court [in Bendectin litigation]." *Id.* at 709. The supreme court, citing many cases in which the plaintiff's scientific testimony in Bendectin cases had already been found scientifically unreliable, said: "Thus, we are not the first court to wrestle with the issues presented by the Bendectin litigation." *Id.* at 711. The supreme court then joined the other jurisdictions. *Id.* at 729–30.

The present case simply pits engineers' views of which modification of an existing design is safer. The jury, supported by the trial court, resolved the issue. We find that there was some evidence, more than a scintilla, to support the jury's finding of negligence and defective design.

### Failure to Warn

Also within its first point of error, G.M. challenges the legal sufficiency of the evidence to support the jury's finding of a marketing defect through a failure to warn. It is G.M's position that the owner's manual had a specific section "directed at parking the truck to warn people to avoid what happened here." There is no dispute that the owner's manual has a warning. The real issue is adequacy. Under a section entitled "Shifting

Into Park" in the owner's manual, there is a box that states, in relevant part:

> CAUTION: It can be dangerous to get out of your vehicle if either: your shift lever is not fully in "P" (Park), or your transfer case is in neutral (on vehicles with 4–wheel drive), or both. Your vehicle can roll. If you have left the engine running, the vehicle can move suddenly. You or others could be injured. To be sure your vehicle won't move, even when you're parking on level ground, follow the steps below....

Then follows an outline of the steps.

 Duty to warn is not in dispute here and is well-established: "If the manufacturer knows or should know of potential harm to a user because of the nature of its product, the manufacturer is required to give an adequate warning." *Crocker v. Winthrop Labs.*, 514 S.W.2d 429, 433 (Tex.1974). The jury found, and the trial court agreed, that there was some evidence, more than a scintilla, to support the jury's finding that this warning was inadequate. A jury could have reasonably found that the average user would not have known that a car could, on its own, move into Reverse and jump backwards when the driver had attempted to put the gear lever into Park, but had failed. A jury could reasonably have found that to be warned that a car, left in Neutral, could roll was not nearly as important as the ramifications about automatic shifting into Reverse when the lever is inadvertently left between Park and Reverse. The jury could reasonably have believed that the warning should have said that if the gear lever is left between Park and Reverse, it may not stay that way, but may move into Reverse on its own after a short delay and cause serious bodily injury or death. The jury may have reasonably believed that had Sanchez known this, and had other consumers similarly situated known this, people would be a lot more careful to make sure the lever is firmly in Park. A jury might have reasonably believed that the warning did not "convey a fair indication of the nature and extent of the danger." 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 71.0 (1990).

G.M.'s first point of error is overruled.

## POINT OF ERROR TWO

### Gross Negligence and Punitive Damages

 G.M. claims in its second point of error that there is no evidence to support a finding of gross negligence and an award of punitive damages. The issue was correctly submitted to the jury, and properly instructed. The seminal case on punitive damages in modern times is *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex.1981), in which the supreme court stated:

> Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

*Burk Royalty*, 616 S.W.2d at 920. This definition, forged out of 100 years of Texas cases, is still the standard. More recently, in a bad faith insurance dispute, the supreme court discussed and refined the elements of gross negligence. The court said gross negligence has two elements:

> (1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

*Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994). This was the instruction the trial court gave the jury in this case in considering the question of whether or not there was gross negligence. The jury found there was.

 "If the evidence is legally sufficient, we may not reverse the trial court's judgment; if it is not legally sufficient, we are compelled to do so." *Id.* at 24. We find that there was evidence, more than a scintilla, to support the jury's findings on both the objective and subjective tests of *Moriel*. The jury may reasonably have believed that, viewed from any perspective, a vehicle that can shift itself into Reverse, pause for a few

seconds, and then lurch backwards with no one at the wheel poses an extreme degree of risk of serious bodily injury or death for anyone in the vicinity. Short of a weapon that is designed to kill and injure, it is hard to imagine what would be more dangerous. A reasonable and fair-minded juror could also have believed, based on the evidence adduced, that G.M. had actual, subjective awareness of the risk involved, but proceeded in conscious indifference in both design and warning. There was ample evidence of similar incidents in various states, including Texas. A jury might reasonably have believed that G.M. had known about this problem since the late 1960s or early 1970s. A jury might also reasonably have believed that G.M. should have made its transmissions less sensitive, and more in accord with the changes made by Ford or Chrysler. Finally, a jury might have reasonably believed that to the extent the hazards of hydraulic neutral cannot be entirely alleviated, G.M. had a duty to warn its customers and owners in plain English that not securing the vehicle properly in Park can result in the extreme risk of the vehicle moving from hydraulic neutral into Reverse and backing up with no one at the wheel. "If a manufacturer knows or should know of potential harm to a user because of the nature of its products, the manufacturer is required to give an adequate warning of such dangers." *Bristol–Myers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex. 1978). A reasonable juror, based on the evidence heard in this case, may have believed that G.M. did not do this, and that a conscious decision was made to downplay the danger.

We are mindful that the testimony on gross negligence was fairly and forcefully contested by G.M. G.M. presented the testimony of an expert, Dr. William Wecker, a former professor of statistics at several universities, to highlight the very small risk of death and serious injury from "driverless backing up accidents from whatever cause." He offered several comparisons of how much easier it was to be killed by lighting, falling in a hole, or drowning in one's own bathtub, than it was to be killed by your pick-up backing over you. All of G.M.'s experts articulated their belief that there was no "ex-treme risk" and hardly any risk at all that this would ever happen, much less that someone would be killed. But the jury also heard that at least some of G.M.'s experts had just testified in another similar case.

When all is said and done, both sides produced credible, competent evidence to support their view of things. Either a "yes" or "no" answer to the question of gross negligence would have been supported by the evidence. The jury found there was gross negligence. There was evidence to support its finding. It was the jury's right to make the decision. We will not disturb it. G.M.'s second point of error is overruled.

## POINT OF ERROR THREE

### Contributory Negligence of Sanchez

G.M. argues in its third and final point of error that the trial court erred in disregarding the jury's finding that Sanchez was fifty percent contributorily negligent. It is G.M.'s position that this finding should reduce the compensatory damages awarded by fifty percent.

Whether this finding is a defense that will reduce the compensatory award depends on the nature of the contributory negligence.

"Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless unreasonably proceeds to make use of the product and is injured by it, he is barred from recovery."

RESTATEMENT (SECOND) OF TORTS § 402A, cmt. "n" (1965).

The Supreme Court of Texas adopted section 402A of the Restatement in recognizing

a cause of action based on strict products liability in *Shamrock Fuel & Oil Sales Co. v. Tunks*, 416 S.W.2d 779 (Tex.1967), and *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967). In the classic case on the subject, *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984), the court said:

> We held that a plaintiff's contributory negligence was no defense to this cause of action. We based this holding on comment "n" of section 402A.... In *Henderson v. Ford Motor Co.*, 519 S.W.2d 87 (Tex.1974), we reaffirmed our adherence to comment "n", stating, "Assumption of risk is the defense; contributory negligence or failure to act reasonably is not."

*Duncan*, 665 S.W.2d at 422–23.

The court, after examining the history and the logic of hidden defects, concluded: "We reaffirm the rule in § 402A, comment 'n' of the *Restatement (Second) of Torts* that negligent failure to discover or guard against a product defect is not a defense.... This rule serves to protect consumer reliance on product safety." *Id.* at 432.

The Texas Supreme Court has reaffirmed many times its position that contributory negligence in the form of failing to discover a defect or to guard against the possibility of a defect in a product does not qualify as contributory negligence under *Duncan's* comparative causation rule. *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex., 1986), *on remand*, 718 S.W.2d 910 (Tex.App.—Texarkana 1986, *vacated by agr.*, 749 S.W.2d 489 (Tex.1988)); *Keen v. Ashot Ashkelon, Ltd.*, 748 S.W.2d 91 (Tex.1988).

*Keen* is the definitive case in this area. In that case, Keen, the plaintiff, was a driver of a motorized vehicle, a hostler, used for pulling loaded trailers from one off-road location to another. Keen knew that there was a general risk in pulling his machine close to a parked trailer, because if it fell over it could injure or kill a person. Nevertheless he did so, and thus in a general sense he was negligent, and the jury found that his negligence contributed 50% to cause his injuries. The trailer fell over because there was a defect in the "sand shoe" that fitted to the dolly leg that holds up the trailer when it is unattached to the truck. This was a latent de-

fect, and a defect unknown to Keen. Thus the situation presented was: a plaintiff is negligent, and his negligence contributes to the injury. However, the real cause of the accident was a latent defect, i.e., a faulty "sand shoe" that gave way and caused the trailer to fall over. The supreme court said:

> Keen took a general risk by pulling his hostler beside the trailer, but he did not know of the particular danger that caused the accident. Keen's contributory negligence amounted to getting too close to a product which turned out to be defective. Because the nature of Keen's negligence was a failure to guard against a defective product, it cannot be used as a defense to reduce the amount of Keen's damage award. As we noted in *Duncan* when we reaffirmed this rule, consumers have a right to rely on product safety. We therefore hold that the trial court properly disregarded the jury's contributory negligence findings.

*Keen* 748 S.W.2d at 93.

Chief Justice Phillips wrote a dissent in *Keen*, stating that he would abandon "any further reliance on the outmoded concepts of comment 'n' of Section 402A of the Restatement (Second) of Torts" and "would adopt a system of pure comparative causation, which would allow the trier of fact to consider all negligent conduct by all parties in apportioning responsibility." *Id.* at 94 (Phillips, C.J., dissenting). However, we find no case of the supreme court, or of any Texas appellate court, that has repudiated *Keen.*

Nonetheless, G.M. argues that *Keen* is no longer the law because it has been superseded by the Texas Tort Reform legislation of 1987, which requires the jury to apportion responsibility among tortfeasors. Tex. Civ. Prac. & Rem.Code Ann. §§ 33.001 et. seq. (Vernon Supp.1996). The Act defines "percentage of responsibility" as the percentage attributable "to each claimant, each defendant ... with respect to causing or contributing to cause in any way, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity violative of the applicable legal standard, or by any combination of the

foregoing, the personal injury, property damage, death or other harm for which recovery of damages is sought." *Id.* § 33.011(4).

 G.M.'s argument is understandable, given the broad language of the Act. But it is not supported by Texas cases, nor should it be supported in this court's opinion. The standards of behavior are different and originate from different legal and equitable sources. Failure to discover or to understand a hidden danger is not an assumption of the risk. If a person does not know the danger, and has no reasonable way to find it out, there cannot be an assumption of the risk. As stated in the Restatement (Second) of Torts:

> The standard [for determining assumption of the risk] is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence ... If by reason of age, or lack of information, experience, intelligence, or judgment, the plaintiff does not understand the risk involved in a known situation, he will not be taken to assume the risk, although it may still be found that his conduct is contributory negligence because it does not conform to the community standard of the reasonable man.

RESTATEMENT (SECOND) OF TORTS § 496D cmt. "c" (1965).

Of course the plaintiff's knowledge or lack of knowledge must be reasonable. A burned man who states he didn't know fire was hot is neither reasonable nor believable.

Refusing to hold a plaintiff in strict liability cases accountable for his failure to discover a hidden design or manufacturing defect or to guard against the possibility of its existence is not unfair to the manufacturer in a strict liability case. The defect is there because the manufacturer was (1) unaware of the defect, or (2) knew of the defect and intentionally concealed it for commercial purposes. Penalizing the injured party under either of the circumstances above offends any sense of justice and rewards the maker of the defective product. As Justice Gonzalez stated in his dissent in *Keen:*

Strong public policy reasons dictate that we continue to reject suggestions that we abandon comment n altogether in fashioning comparative causation schemes. As one court stated, "to penalize a consumer for failing to discover defects or to guard against them places a burden on consumers which strict liability was intended to remove."

*Keen,* 748 S.W.2d at 97.

The hidden defect in the instant case was that the pick-up could jump into reverse, after a dangerous pause, if the gear lever was inadvertently left between Park and Reverse. There is no evidence that Sanchez knew that, and it is unlikely that anyone in the courtroom other than the testifying engineers knew it. Sanchez was found to be contributorily negligent, but his negligence, as did Keen's, "amounted to getting too close to a product which turned out to be defective." *See id.* at 93 ("[C]onsumers have a right to rely on product safety. We therefore hold that the trial court properly disregarded the jury's contributory negligence findings.").

We now turn to a review of cases decided after the passage of the Comparative Negligence Act to determine if they have any impact on the holding in *Keen.*

*Hernandez v. American Appliance Mfg. Corp.,* 827 S.W.2d 383 (Tex.App.—Corpus Christi 1992, writ denied), involved a worker who was installing a counter top by using contact adhesive. The formica glue vapors were ignited by a water heater located in the kitchen. Hernandez was badly burned, and eventually died of his injuries. The jury found the negligence of the deceased caused 90% of the occurrence, and the court reduced the damages accordingly. There was evidence that the deceased knew he was taking a risk by using adhesives near a water heater without first extinguishing the water heater pilot light. The court accepted that *Keen* was still valid law, but distinguished the fact situation because the plaintiff was aware of the risk and voluntarily encountered it. The court explained that Hernandez's knowledge of danger distinguished the case from *Keen.* In further discussion, the court said this distinction centers on the difference between

latent and patent defects. In *Keen,* there was a latent defect, while in *Hernandez,* "[t]he product feature in question is a pilot light which is a patent feature of a water heater known to the deceased." *Hernandez,* 827 S.W.2d at 391. As the defect in Sanchez was latent, and unknown to the victim, the facts in *Hernandez* obviously lead to different results from the result we reach today. *Hernandez* principally teaches us that the court continues to consider *Keen* the law after the passage of the Act.

*Webster v. Lipsey,* 787 S.W.2d 631 (Tex. App.—Houston [14th Dist.] 1990, writ denied), involved an all-terrain cycle (ATC) accident. The driver of the ATC had a passenger aboard; the vehicle turned over, and the question arose as to whether the driver knew it was dangerous to have a passenger on the back. The driver said he had no knowledge of the defect and therefore was not negligent as a matter of law under *Keen.* However, there was testimony that the driver knew the ATC handled differently with a passenger. The court said that "[w]hile he may not have recognized this as a design defect per se, his knowledge distinguishes this case from *Keen." Webster,* 787 S.W.2d at 637. The court then went on to discuss *Keen* and differentiated between a failure to guard against a defect in *Keen* and the voluntary encounter of a known danger in the case before it (riding with a passenger when the handling was difficult). The court considered *Keen* valid law, but distinguished the facts.

The relatively recent case of *Sims v. Washex Machinery Corp.,* 932 S.W.2d 559 (Tex. App.—Houston [1st Dist.] 1995, no writ) also cites *Keen* as valid law: "The negligent failure to discover or guard against a product defect is not a defense against strict liability." *Sims,* 932 S.W.2d at 564.

Our supreme court has never disavowed *Keen,* before or after the passage of the Act. In fact the court has continued to mention *Keen.* In *Dresser Indus., Inc. v. Lee,* 880 S.W.2d 750, 755 (Tex.1993), the court acknowledged that it has "held that a plaintiff has no such duty [to discover defects in a product]." *Dresser Indus., Inc.,* 880 S.W.2d at 755. The court went on in the discussion

of the case to say "Assuming that this rule is correct...." *Id.*

This court is aware of only one case that holds that *Keen* is no longer the law. This is the federal case of *Bradshaw v. Freightliner Corp.,* 937 F.2d 197 (5th Cir.1991). In *Bradshaw* a truck driver hurt his back when he hit a hole in the road, which threw him up, and the seat did not cushion as it was designed to do when he came back down. The defendant was found liable, but Bradshaw was held to be contributorily negligent, and the court reduced his damages accordingly. The court said that the comparative negligence law made *Keen* no longer applicable. The point is summarily treated though, and the holding has not been followed.

Although a majority of states, like Texas, has adopted some scheme of comparative fault or negligence, the states are "hopelessly divided on when and what to compare and how to implement the comparison." *Webb v. Navistar Trans. Corp.,* 692 A.2d 343, 354–5 (Vt.1996) (Johnson, J., dissenting). Some states compare all contributory negligence, without categorization; others compare only the contributory negligence that rises to the level of assumption of the risk or unforeseeable misuse; and some compare all types of contributory negligence, except when the negligence can be labeled as a failure to discover or guard against an unknown risk. *Id.*

Our survey of other jurisdictions suggests that while there is no clear majority on any of these positions, a significant number of states adhere to the principles outlined in comment "n" of the Restatement (Second) of Torts. A few of these states adhere to comment "n" by express statutory provisions. *See, e.g.,* IDAHO CODE § 6–1405 (1990); MON. CODE ANN. § 27–1–702 (1995). In other states, the courts have determined that broadly worded comparative negligence statutes either don't apply to strict liability cases at all or only apply when the plaintiff's contributory negligence reaches the level of assumption of the risk. See, *e.g., Coney v. J.L.G. Indus., Inc.,* 97 Ill.2d 104, 73 Ill.Dec. 337, 454 N.E.2d 197 (1983); *Austin v. Raybestos–Manhattan, Inc.,* 471 A.2d 280 (Me.1984); *Jack Frost, Inc. v. Engineered*

*Bldg. Components Co., Inc.,* 304 N.W.2d 346 (Minn.1981); *Johansen v. Makita U.S.A., Inc.,* 128 N.J. 86, 607 A.2d 637 (1992); *Sandford v. Chevrolet Div. of General Motors,* 292 Or. 590, 642 P.2d 624 (1982); *Roy v. Star Chopper Co.,* 584 F.2d 1124 (1st Cir.1978) (applying Rhode Island law), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979);*Star Furniture Co. v. Pulaski Furniture Co.,* 171 W.Va. 79, 297 S.E.2d 854 (1982);*Schneider Nat'l, Inc. v. Holland Hitch Co.,* 843 P.2d 561 (Wyo.1992). In addition, a few jurisdictions, while not squarely addressing comment "n", offer indirect support for the position we take today. *See, e.g., Omnetics, Inc. v. Radiant Tech. Corp.,* 440 N.W.2d 177 (Minn.Ct.App.1989) (basing plaintiff's comparative negligence on his knowledge of the risk); *Scott By and Through Scott v. Pacific West Mountain Resort,* 119 Wash.2d 484, 834 P.2d 6 (1992) (comparative negligence standard applies only to risks *actually assumed* by the plaintiff).

We realize that some jurisdictions have chosen to apply their comparative negligence statutes more broadly, to include all plaintiff negligence. *See, e.g., Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978); *Champagne v. Raybestos–Manhattan, Inc.,* 212 Conn. 509, 562 A.2d 1100 (Conn.1989); *Powers v. Hunt–Wesson Foods, Inc.,* 64 Wis.2d 532, 219 N.W.2d 393 (1974). After a careful consideration of the case law both in Texas and in other states, however, we believe that those jurisdictions refusing to hold a plaintiff liable for his or her failure to discover a hidden defect have the better argument. Without such a rule, the ability to hold manufacturers liable for defective products, without having to show actual fault, will evaporate. We are not willing to follow the states that have chosen that path. As a dissenter in one of those states noted, "Because imperfect user behavior is a common, indeed an inevitable, contributor to most product-related accidents, every product liability case hereafter will center around the behavior of the parties rather than the safety of the product." *Webb,* 692 A.2d at 356 (Johnson, J. dissenting).

This court feels that the sound policy reasons expressed in the Restatement (Second),

and followed in *Keen* have in no way been abrogated by the passage of Texas's Comparative Negligence Act. This holding is in harmony with other Texas courts who have considered the matter. We overrule G.M.'s third point of error and affirm the trial court.

Dissenting opinion by GREEN, J.

GREEN, Justice, dissenting.

In this design defect product liability action, the plaintiffs failed to produce any competent evidence of a safer alternative design to the GM 700R4 automatic transmission involved in this accident, which proof was necessary for recovery. Moreover, there was no evidence to support a causation finding on the plaintiffs' failure-to-warn claim because it was established that the warning provided, had it been heeded, would have prevented the accident. Consequently, defendants are entitled to a judgment. Because the majority instead affirms the trial court's judgment in favor of the plaintiffs, I respectfully dissent.

*No Evidence of a Safer Alternative Design*

"In determining whether a product is defectively designed, the jury must conclude that the product is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use." *American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 432 (Tex.1997). As part of the design defect inquiry, it is necessary to evaluate the product in light of the economic and scientific feasibility of safer alternatives. *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 384 (Tex.1995). That is to say, if there are no safer alternatives to a product design, the product is not unreasonably dangerous as a matter of law. *Grinnell,* 951 S.W.2d at 433; *Caterpillar,* 911 S.W.2d at 384. To establish that an alternative design is safer, it is necessary to show that the alternative design would have prevented the injury. *See Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 746 (Tex.1980). Accordingly, to prevail in this case, the plaintiffs were required to prove the existence of an economically and scientifically feasible transmission that was safer than the GM 700R4. The majority

points to the testimony of the plaintiff's expert witness, Simon Tamny, for this proof.

Tamny's testimony on the issue of safer alternative design consisted entirely of suggested modifications to the 700R4 transmission. Specifically, he would redesign the transmission detent lever, or "rooster comb," in the area between Park and Reverse to steepen the angle on the Park side of the tooth, move the peak of the tooth 2½ degrees closer to Reverse, sharpen the tip of the peak from thirty-one-thousandths of one inch to ten-one-thousandths of one inch, and stiffen the spring used on the roller that travels up and down the tooth. He said these design features were either currently in use by, or available to, industry manufacturers and were thus technologically and economically feasible. He further said that, while these changes to the rooster comb design would not prevent the transmission from being misshifted and left in "hydraulic neutral," a position between Reverse and Park, the redesign would prevent the transmission from falling back into Reverse. Tamny admitted, however, that he had never built or tested a rooster comb with the design configuration he proposed. He nevertheless boldly concluded that his rooster comb modifications would make the GM transmission safer.

In *E.I. du Pont de Nemours & Co. v. Robinson,* the supreme court identified a list of factors to be considered in determining the admissibility of expert testimony. 923 S.W.2d 549, 557 (Tex.1995). The court later held that the same factors may be applied by appellate courts when performing no evidence reviews of scientific evidence. *See Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997). These factors include:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert;

(3) whether the theory has been subjected to a peer review and publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses that have been made of the theory or technique.

*Id.*

Applying these factors to Tamny's testimony, it is plain to see that the testimony does not measure up to the minimum standards for reliability required by the supreme court to satisfy the "more than a scintilla" test for no evidence review in cases grounded in scientific evidence. *See Havner,* 953 S.W.2d at 711–14 (expert's bare opinion will not suffice as evidence); *Schaefer v. Texas Employers' Ins. Ass'n,* 612 S.W.2d 199, 204–05 (Tex.1980) (expert's testimony based on mere possibility, speculation, and surmise was no evidence). Tamny's theory of design defect is based on a design that has never been tested, relies exclusively on his subjective interpretation of how the design would function, and has not been submitted for peer review or publication. Moreover, because of the foregoing, Tamny's conclusions have a high potential for inaccuracy, and it is unlikely his armchair analytical techniques would be accepted as valid by the relevant scientific community.

Other than Tamny's bare conclusory statement that his rooster comb would have prevented the accident, there is nothing in the record to suggest that his design is indeed safer than the 700R4. The record does not show, for example, that any one or combination of several of Tamny's proposed rooster comb modifications has a better industry record than the 700R4 design in preventing accidental shifts from hydraulic neutral into Reverse. Without testing the Tamny design, any conclusion that it would have prevented the accident that killed Pookey Sanchez is pure conjecture and speculation. Consequently, Tamny's testimony failed to attain the status of "some evidence" that a transmission thus manufactured was safer than the GM version.

Because Tamny's testimony is the only evidence on the question of whether there is a safer alternative to the design of the GM 700R4 transmission, and because his testimony is based on mere possibility, speculation, and surmise and amounted to no more than a scintilla of evidence, the plaintiffs failed as a matter of law to prove that the GM transmission was unreasonably dangerous as designed.

*No Evidence of Producing Cause*

GM provided instructions in the owner's manual concerning vehicle operations, including specific warnings about making sure the transmission was fully engaged in Park before exiting the vehicle. Users were told:

CAUTION: It can be dangerous to get out of your vehicle if either: your shift lever is not fully in "P" (Park), or your transfer case is in neutral (on vehicles with 4–wheel drive), or both. Your vehicle can roll. If you have left the engine running, the vehicle can move suddenly. You or others could be injured. To be sure your vehicle won't move, even when you're parking on level ground, follow the steps below.

1. Hold the regular brake pedal down with your right foot and apply the parking brake all the way first. Follow the Parking Brake instructions in this manual for your vehicle, also refer to "Torque Lock."

2. To move the shift lever into "P" (Park), pull the lever toward you and move it up as far as it will go.

3. Be sure the transfer case is not in neutral, to help keep the vehicle from rolling (four-wheel drive vehicles only).

4. If you don't have to leave the engine running, (briefly)—

—Move the ignition key to "LOCK."

—Remove the key and take it with you.

5. Before you leave the driver's seat, check that your vehicle is in park by trying to pull the shift lever out of "P" (Park) —— by pulling down on the shift lever without first pulling it toward you. If you can do this, it means that the shift lever wasn't fully locked into "P" (Park). Or, check that your vehicle is in park by pocketing the key. If you can remove the key, the vehicle is in "P" (Park).

Lack of adequate warnings can render a product unreasonably dangerous. *See General Motors Corp. v. Saenz*, 873 S.W.2d 353, 358 (Tex.1993). But an inadequate warning cannot be a producing cause of the plaintiff's damages when it would have prevented the accident if followed. "If despite the inadequacy of GM's instructions, following them would have prevented the accident, then their inadequacy could not have caused the accident. There is no presumption that a plaintiff who ignored instructions that would have kept him from injury would have followed better instructions." *Id.* at 359.

The jury found the warning given by GM was inadequate, and the majority upholds this finding. But that is only the first step of the analysis. The majority wholly fails to address the all important question of whether the inadequate warning was a producing cause of the accident. In this case, it is hard to imagine any instruction or warning that would have been more effective than the one given. But assuming it was inadequate, as found by the jury, it is inescapable that had Pookey Sanchez followed the warnings given, the accident would not have happened. That being the case, plaintiffs failed as a matter of law to establish that any failure-to-warn was a producing cause of the plaintiffs damages.

*Conclusion*

There is no doubting the tragedy of the accident resulting in this lawsuit. But the law as it has developed makes it clear what is necessary in the way of evidence to establish a design defect or failure-to-warn cause of action. The plaintiffs have not met this minimum evidentiary requirement, and because the majority holds otherwise, I respectfully dissent.